**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SHANE CAMPBELL, *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>CONNECT HEARING, INC.,<br><br>Defendant. | **Case No. 1:26-cv-06359**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**[1]<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shane Campbell ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Connect Hearing, Inc. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## INTRODUCTION

1. This is a class action lawsuit brought on behalf of all AudioNova patients who accessed hearing care services on www.AudioNova.com (the "Website"). Defendant is a nationwide audiology network that owns and operates the AudioNova brand and the Website.

2. Defendant purports to provide patient-centered, expert hearing care to its patients.

3. However, in pursuit of profit and without regard for its patients' medical privacy, Defendant aids, employs, agrees, and conspires with Google, LLC ("Google"), an unknown third party, to intercept its patients' communications as they seek hearing care services on the

[1] Defendant has provided written consent for Plaintiff to file this amended complaint pursuant to Fed. R. Civ. P. 15(a)(2).

Website. This is enabled through Defendant's surreptitious installation of complex computer code on the Website, which serves to track and disclose AudioNova patients' activity, in real time, to Google.

4. Confidentiality is paramount to the medical industry. Despite its legal and ethical duties to protect patient information, Defendant undermined the importance of safeguarding the identities and personal medical information of individuals seeking hearing care services and breached its patients' trust—violating federal and state law—including the Health Insurance Portability and Accountability Act ("HIPAA").

5. Healthcare providers, like Defendant, are legally required to safeguard patients' confidential and sensitive health information. This means that any data related to patients' hearing health and treatment history, including patient status, must be kept confidential and secure. Given these protections, patients reasonably expect that information related to their hearing health treatment will remain confidential.

6. Unbeknownst to Plaintiff and members of the putative class, and contrary to Defendant's duty as a hearing care provider, Defendant discloses its patients' protected health information ("PHI") to third parties, including Google, for targeted advertising purposes.

7. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of AudioNova patients and to recover statutory and equitable damages for Defendant's unauthorized collection, storage, and use of putative class members' PHI in violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.* and the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code §§ 631 and 632.

## PARTIES

8. Plaintiff is, and has been at all relevant times, a resident and citizen of Los Angeles, California. In or around June of 2022, Plaintiff visited the Website to make an appointment for hearing care services. At all relevant times hereto, Plaintiff maintained an active Google account.

9. Specifically, Plaintiff scheduled an appointment for a hearing aid check at Defendant's Beverley Hills, California office location.

10. Unbeknownst to Plaintiff, Defendant disclosed his PHI—including specific details about his hearing care appointment—to Google for targeted advertising purposes. Defendant also disclosed sufficient personally identifiable information ("PII") for Google to identify Plaintiff as the specific individual booking his hearing care appointment, as described more thoroughly below.

11. After booking an appointment on the Website, Plaintiff began receiving targeted advertisements for similar products and services. Plaintiff would not have booked an appointment on the Website if he knew the Defendant was violating his privacy by sharing his PHI with unknown third parties.

12. At all relevant times Plaintiff maintained an active Gmail account. When registering for his Gmail account, Google required that he provide his full legal name, date of birth, and gender. Every time Plaintiff accesses his Gmail account, Google collects information related to his IP address and electronic device (*e.g.*, browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes. Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed below. Google utilizes all of these

tracking features in order to build robust consumer profiles it can then leverage for targeted advertising purposes. Plaintiff used the same devices and browsers to access Defendant's Website and his Gmail account.

13. Defendant Connect Hearing, Inc. is a Delaware corporation with its principal place of business at 750 N Commons Drive, Suite 200, Aurora, Illinois 60504.

14. Defendant owns and operates the Website. The Website connects patients with hearing care providers across the country, including California.

15. Defendant chose to activate the Google Analytics cookie and DoubleClick API (the "Tracking Technologies") on the Website, whereby it disclosed confidential patient PHI to Google for targeted advertising.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). Further, this action is a putative class action under the Class Action Fairness Act, as Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

17. This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of the Court and because Defendant is headquartered in this State. Additionally, Defendant has, at all times relevant hereto, systematically and continually conducted business in Illinois, and has therefore intentionally availed itself of the benefits and privileges of Illinois law.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant

resides in this District. Furthermore, a substantial portion of the events or omissions giving rise to the claims occurred in this District.

## <u>FACTUAL ALLEGATIONS</u>

### A. Overview of the CIPA and ECPA

19. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

20. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

21. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

22. As part of CIPA, the California Legislature introduced § 631(a), which imposes

liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

> (i) "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";
>
> (ii) "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or
>
> (iii) "us[ing], or attempt[ing] to use . . . any information so obtained."

23. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

24. CIPA also outlaws "us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication." Cal. Penal Code § 632. The term "confidential communications" means "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes . . . circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c).

25. Individuals may bring an action against a violator of CIPA §§ 631–32 for $5,000 per violation. Cal. Penal Code § 637.2.

26. In a manner similar to CIPA, the Federal Wiretap Act (i.e. the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."2

27. The ECPA provides "any person who intentionally intercepts, endeavors to

---

[2] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . shall be punished . . . or shall be subject to suit." 18 U.S.C. § 2511 (1)(a)

28. The term "electronic communication" broadly encompasses "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

29. Although the ECPA does not apply "where one part[y] to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[3]

**B. Health Information is Sensitive and Confidential**

30. Defendant owns and operates the AudioNova Website, where patients can access hearing care services, including general and specialized hearing care for a wide array of hearing care services.

31. Under federal law, a healthcare provider—including hearing care professionals—may not disclose PHI without the patient's express written authorization.

32. The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[4]

---

[3] 18 U.S.C. § 2511(d).
[4] U.S. DEPT. OF HEALTH & HUM. SERVS., THE HIPAA PRIVACY RULE,

33. A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[5]

34. The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id.*

35. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant because they are knowingly disclosing individually identifiable health information relating to their patients.

36. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

---

https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[5] 42 U.S.C. § 1320d-6.

e. Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

f. Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

37. Health care organizations regulated under HIPAA, like Defendant, may use third-party tracking tools in a limited way to perform analysis on data key to operations. However, they are not permitted to use these tools in a way that may expose patients' PHI to vendors (as shown below). As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.**[6]

38. The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology

[6] U.S. DEPT. OF HEALTH & HUM. SERVS., USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added).

> vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[7]

39. Plaintiff and members of the putative class face exactly the risks over which the government expresses concern. Defendant's unlawful conduct resulted in third parties intercepting information regarding Plaintiff and putative class members' hearing care health appointments when they accessed Defendant's Website to book appointments for hearing care services.

40. The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or **dates of appointments**, as well **as an individual's IP address** or geographic location, medical device IDs**, or any unique identifying code.** [8]

41. Crucially, the Bulletin continues:

> **All such [individually identifiable health information ("IIHI")] collected on a regulated entity's Websites or mobile app generally is PHI**, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as **IP address** or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its Websites or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus **relates to the individual's past, present, or future health or health care** or payment for care. [9]

42. Then, in July 2022, the Federal Trade Commission ("FTC") and the Department

---

[7] *Id.* (emphasis added).
[8] *Id.* (emphasis added).
[9] *Id.* (emphasis added).

of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] Websites or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."
>
> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] Websites," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."
>
> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a Websites or mobile app.
>
> In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, **medical treatments, frequency of visits to health care professionals, and where an**

**individual seeks medical treatment.** [10]

43. The FTC is unequivocal in its stance. The FTC has specifically informed healthcare companies, like Defendant, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.
>
> For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.
>
> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[11]

44. Therefore, Defendant's conduct, as described herein, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

### C. Overview of Tracking Technologies

45. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (*e.g.*, computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

---

[10] FED. TRADE COMM'N, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Jul. 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (emphasis added).

[11] FED. TRADE COMM'N, COLLECTING, USING, OR SHARING CONSUMER HEALTH INFORMATION? LOOK TO HIPAA, THE FTC ACT, AND THE HEALTH BREACH NOTIFICATION RULE, https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach.

46. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

47. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request:** an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies:** a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response:** an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

48. A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

49. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

50. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying

the web browser's user. The Tracking Technologies embedded on the Website by Defendant constitutes Source Code and function in a substantially similar way.

### D. Google's Tracking Technology

51. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

52. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[12] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

53. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

[12] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

54. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for Website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

55. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

### 1. **<u>Google Analytics</u>**

56. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

57. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

58. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[13] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps,

[13] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.

throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[14]

59. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when AudioNova patients are booking their appointments. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a Website. The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

60. In other words, when interacting with the Website, an HTTP Request is sent to Defendant's server, and that server sends an HTTP Response including the Markup that displays the Website visible to the patient and Source Code, including Google Analytics.

61. Thus, Defendant is essentially handing their patients a tapped device. Once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant, and transmits those communications to third parties like Google.

---

[14] *Id.*

62. Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

63. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

64. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

65. The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the hearing care appointments being scheduled by the patient. Google also received the reason for the appointment as well as additional PII, including the patients' IP address, device information, and User-IDs.

66. For example, the Website utilizes Google's "cid" or "Client ID" function to identify patients as they navigate the Website.[15]

67. In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

68. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

69. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[16]

70. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track Website users just as cookies do, but it employs much more subtle techniques.[17] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

71. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[18]

---

[15] Eduard Kozakov, *What Is Google Client ID In GA4: Detailed Setup Guide For 2024*, OWOX, https://www.owox.com/blog/use-cases/google-analytics-client-id.
[16] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.
[17] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.
[18] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

72. Browser-fingerprints are personal identifiers. Google Analytics can collect browser-fingerprints from Website visitors.

73. As enabled by Defendant, Google collects vast quantities of consumer data through Google Analytics.

74. Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

75. Google then utilizes such information for its own purposes, such as targeted advertising.

**2. The DoubleClick API**

76. The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[19]

77. DoubleClick was acquired by Google in 2008. In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google Marketing Platform.[20] The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and "DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[21]

---

[19] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en.

[20] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google/products/marketingplatform/360/introducing-google-marketing-platform/.

[21] *Introducing Google Marketing Platform*, GOOGLE, https://support.google.com/displayvideo/answer/9015629?hl=en.

78. As relevant here, however, data is still sent from the Website to Google through the DoubleClick API. This process is akin to a person setting an old e-mail address to automatically forward messages to a new e-mail address, rather than manually updating their contact information on a number of different websites. Messages would still be sent to the old e-mail address, but would be routed to the same end recipient, the same way data sent to DoubleClick still ends up with Google.

79. Once integrated into a website, the DoubleClick API allows a website owner to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising.[22]

80. Once Defendant intercepts the Website communications through the DoubleClick API and discloses such information to Google (in real time), Google has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against abuse and fraud, and personalize content and ads you see on Google and on [] partners' sites and apps."[23]

81. For example, Google utilizes the "auid" ("Advertiser User ID") and the "cid" ("customer ID") cookies which identify unique users and unique interactions with a website.

82. Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on those habits. This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and services they are interested in.

---

[22] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482.
[23] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

83. Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

84. In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

85. Google views and processes every piece of information collected from the Google Analytics tracking technology and DoubleClick API, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

86. Google partners with Defendant in its marketing efforts. The Google Analytics cookie and DoubleClick API are employed on the Website in the manner described throughout the Complaint.

**E. Defendant Violates the Privacy Rights of its Patients**

87. Defendant owns and operates over 1,500 hearing care clinics across North America, including 36 locations in California.

88. Defendant owns and operates the Website, which offers patients a variety hearing care services including, but not limited to, hearing tests, hearing aids, and other hearing loss solutions.

89. When a patient visits the Website, they are prompted to fill out text boxes indicating their first name, last name, email address, zip code, and phone number. *See* Fig. 1.




**Figure 1**

90. Additionally, patients may browse for clinics located nearby using a search feature. From this, patients can directly schedule an appointment at the clinic of their choosing. *See* Fig. 2.



**Figure 2**

91. With this feature, patients may schedule their appointments directly at the clinic location of their choosing. *See* Fig. 3.




**Figure 3**

92. Once a client inserts their name and contact information, a successful booking occurs with a set date, appointment time, and location. *See* Fig. 4.




**Figure 4**

93. Unbeknownst to its patients, Defendant discloses their personally identifiable and protected health information to Google starting from the beginning of the entire appointment process.

94. For example, when a patient provides Defendant with their email address, Google's DoubleClick API intercepts the email address in the form of a hashed value. *See* Fig. 5.



https://googleads.g.doubleclick.net/pagead/vie...

Headers | Payload | Preview | Response | Initiator | Timing | Cookies

| | |
|---|---|
| did | dYWJhMj |
| gdid | dYWJhMj |
| value | 0 |
| hn | www.googleadservices.com |
| npa | 0 |
| gclaw | Cj0KCQjw7IjOBhDyARIsAFzrWQw_pxUPUCucMJ73N9fMHVC5YAvsa6tJTg-ImlKL1Pxf9b4UsO0KpDMaAhLFEALw_wcB |
| pscdl | noapi |
| auid | 1995851034.1779803730 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;148.0.7778.179\|Google%20Chrome;148.0.7778.179\|Not%2FA)Brand;99.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| ec_m | #field-:rj:*INPUT:true:18:false*1 |
| ec_sel | #field-:rj: |
| ec_meta | INPUT:true:18:false |
| ec_lat | 5 |
| ec_s | 1 |
| ec_mode | a |
| _tu | KA |
| gcl_ctr | 5~0~0~0 |
| data | ads_data_redaction=false |
| category | acrcp_v1_512 |
| em | tv.1~em.IWrJzP7XyQybS1drZhY8yV0pE8PG7CNbPk4P-hWu-7o |
| ct_cookie_present | false |
| crd | CLTesQIl8t-xAgit4bECCKG4sQIlscGxAgiwwbECCLHDsQIlisWxAgjCybECCLTGsQIlk9qxAgjb3LECClfbsQIl08WxAgjrzLECCO3OsQIl1c-xAgj02rECCJfUsQIlyduxAgix4bECCLPhsQIlpt2xAgiw3rECClDbsQJKGXRyaWdnZXIsIG5vdC1ldmVudC1zb3VyY2VaAwoBAWIDCgED |
| cerd | CgEA |
| eitems | ChAI8InV0AYQyK30m9-Y8MttEh0ApjNr7RUpbOiion0JTcWmlRneEir0UyHFPGOcug |
| fsk | ChAI8InV0AYQreDa2Y6p99onEiwA698aNAJAylHTJhnNGVenQD7BGDcwEawojBAUJOJ-HVgzBN4iA-kw_UDkahoC8nM |
| pscrd | IhMI5NW3-Y3XlAMVxTPQBB3W3gboOhpodHRwczovL3d3dy5hdWRpb25vdmEuY29tL0JXQ2hFSThJblYwQVlRNXFIT3g0ZUctY1hGQVJJc0FNSHBhVXRGQXExSzE0enBjbncxU2E5cUpHTkVCZFd3U1J0VngzbjZMaFdqZ0haZHBuZk9DMmxvSzlrehYICVjpxrECWOnGsQJiCAgAEAAYACAA |

**Figure 5**

95. Defendant also discloses to Google when a user schedules their hearing appointment. *See* Fig. 6.

https://www.google-analytics.com/g/collect?v=...

× Headers **Payload** Preview Response Initiator Timing

| | |
|---|---|
| npa | 0 |
| dma | 0 |
| gdid | dYWJhMj |
| _eu | AAAAAAQC |
| are | 1 |
| cid | 1759800789.1779803731 |
| frm | 0 |
| lps | 1 |
| pscdl | noapi |
| rcb | 5 |
| sr | 2560x1441 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;148.0.7778.179\|Google%20Chrome;148.0.7778.179\|Not%2FA)Brand;99.0.0.0 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| ul | en-us |
| _s | 3 |
| tag_exp | 0~115938466~115938468 |
| sid | 1779808843 |
| sct | 2 |
| seg | 1 |
| dl | https://www.audionova.com/appointment/ |
| dr | https://www.google.com/ |
| dt | Book a Hearing Test Appointment Online \| AudioNova |
| _tu | KA |
| en | generate_lead |
| ep.form_name | contact_form |

**Figure 6**

96. These disclosures are highly detailed. Through full-string URLs and "custom event" data, Google receives information indicating the reason for booking the appointment (i.e. tinnitus), users' patient status, and the clinic location where the appointment is to take place. *See* Fig. 7.

| | |
|---|---|
| v | 2 |
| tid | G-9FZLN0GNYL |
| gtm | 45je57o0v9188185174z89186880401za200zb9186880401zd9186880401 |
| _p | 1753736840669 |
| gcs | G111 |
| gcd | 13v3v3v3v5l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~104684208~104684211~104948813 |
| gdid | dYWJhMj |
| cid | 500938582.1753387879 |
| ul | en-us |
| sr | 2560x1441 |
| ir | 1 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not)A%253BBrand%3B8.0.0.0%7CChromium%3B138.0.7204.158%7CGoogle%2520Chrome%3B138.0.7204.158 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | EAAAAAQ |
| dl | https%3A%2F%2Fwww.audionova.com%2Ftinnitus-solutions%2F |
| dr | https%3A%2F%2Fwww.audionova.com%2Fclinics%2Fca%2Fsan-jose%2F840-willow-st |
| dt | Discover%20Tinnitus%20Solutions |
| sid | 1753736486 |
| sct | 6 |
| seg | 1 |
| _tu | Kg |
| _s | 1 |
| tfd | 3584 |

**▾ Request Payload**

en=page_view&_et=959
en=page_view&_et=556&dl=https%3A%2F%2Fwww.audionova.com%2Fappointment%2F&dt=Book%20An%20Appointment

**Figure 7**

97. Google knows exactly who is scheduling an appointment. As explained *infra*, Google receives the hashed email address of every patient who schedules an appointment.

98. Moreover, in HTTP communications, the patient's IP address is inherently included in every network request. In addition to its patients' IP addresses, Defendant, through Google Analytics, disclosed information about their specific devices and User-IDs to Google,

allowing Google to link such information to an individual's specific identity.

99. Defendant also uses and causes the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications about their appointment details.

100. Defendant sent these identifiers (*e.g.*, cid, auid, IP address, and device information) with each patient's "event" data.

101. Such event data includes the fact that a patient is seeking medical treatment (*i.e.*, hearing care services).

102. When patients share their personal information with medical professionals, they expect this information to be kept confidential. Moreover, when consumers seek a specific treatment from medical professionals, they also expect this highly sensitive information to be kept confidential.

103. If patients knew Defendant was sharing their personal information for targeted advertising purposes, they would seek hearing care services with another company. Through the above-listed third-party tracking services, which Defendant used via the software code installed, integrated and embedded into the Website, Defendant disclosed their patients' legally protected PII and PHI.

104. By installing, integrating and embedding Google Analytics and the DoubleClick API into the Website, and by directing such installation, integration and embedding, Defendant aided and conspired with the third parties and others to allow those third-party entities to contemporaneously and surreptitiously intercept the Website communications of Defendant's patients without the patient's consent.

105. Defendant engages in this deceptive conduct for its own profit at the expense of

their patients' privacy. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

### F. "Hashed" Data is Not Anonymous Data

106. The Federal Trade Commission routinely evaluates privacy representations by companies. When it comes to hashing the FTC has said the following:

> Companies often claim and act as if data that lacks clearly identifying information is anonymous, but data is only anonymous when it can never be associated back to a person. If data can be used to uniquely identify or target a user, it can still cause that person harm.
>
> One way that companies obscure personal data is through "hashing." Hashing involves taking a piece of data—like an email address, a phone number, or a user ID—and using math to turn it into a number (called a hash) in a consistent way: the same input data will always create the same hash.
>
> . . .
>
> This logic is as old as it is flawed – hashes aren't "anonymous" and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized. FTC staff will remain vigilant to ensure companies are following the law and take action when the privacy claims they make are deceptive.[24]

107. Thus, Defendant sent and Google received Plaintiff and Class Members' personally identifiable information regardless of whether it was hashed or plain text.

### G. Tolling

108. Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of the Tracking Technologies onto the Website.

---

[24] *No, hashing still doesn't make your data anonymous*, FEDERAL TRADE COMMISSION (Jul. 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

109. The Tracking Technologies described herein are entirely invisible to a website visitor.

110. Through no fault or lack of diligence, Plaintiff and putative class members were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

111. Plaintiff and putative class members were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

112. Defendant had exclusive knowledge that the Website incorporated the Tracking Technologies yet failed to disclose to its users, including Plaintiff, that by scheduling appointments through the Website, their PII and appointment information would be disclosed to Google.

113. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users PII and appointment information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their PII and purchase information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

114. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

115. The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the initial complaint in this matter.

## CLASS ALLEGATIONS

116. **Class Definition:** Plaintiff brings this action individually and on behalf of a class

of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure defined as: All natural persons in the United States who, during the Class Period, possessed a Google account and scheduled an appointment on www.AudioNova.com (the "Class").

117. Plaintiff also brings this action on behalf of a subclass of natural persons in California who, during the Class Period, possessed a Google account and scheduled an appointment on www.AudioNova.com (the "Subclass").

118. Plaintiff reserves the right to modify the class definition or add subclasses as necessary prior to filing a motion for class certification.

119. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

120. Excluded from the proposed Class is Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

121. **Numerosity:** Members of the Class and Subclass are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class and Subclass Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the Class and Subclass. The identity of such membership is readily ascertainable from Defendant's records and the records of Google.

122. **Commonality and Predominance:** There is a well-defined community of

interest in the questions of law and fact involved affecting the members of the proposed Class and Subclass. The questions of law and fact common to the proposed Class and Subclass predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:

a. Whether Defendant's acts and practices violated the ECPA and CIPA;

b. Whether Plaintiff and members of the proposed Class and Subclass are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

123. **<u>Typicality</u>:** The claims of the named Plaintiff are typical of the claims of the Class and Subclass because Plaintiff, like all other class members, scheduled a medical appointment on the Website and had his confidential electronic communications intercepted and disclosed to Google.

124. **<u>Adequacy</u>:** Plaintiff is an adequate representative of the Class and Subclass because his interests do not conflict with the interests of the Class he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Class and Subclass will be fairly and adequately protected by Plaintiff and his counsel.

125. **<u>Superiority</u>:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class and Subclass. Each individual Class and Subclass Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.

Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Violation Of The Electronic Communication Privacy Act, 18 U.S.C. § 2511, *et seq.* (On Behalf of the Class)

126. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

127. Plaintiff brings this claim on behalf of himself and members of the Class.

128. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

129. The ECPA protects both sending and the receipt of communications.

130. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

131. The transmission of Plaintiff's sensitive and personal information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

132. The transmission of PHI between Plaintiff and Class Members and Defendant's

Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

133. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

134. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

135. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

136. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant and Google used to track Plaintiff's and Class Members' communications while they were navigating the Website;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' mobile devices;

d. Defendant's and Google's web and ad servers; and

e. The plan that Defendant and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

137. Plaintiff's and Class Members' interactions with Defendant's Website are

electronic communications under the ECPA.

138. By utilizing and embedding the Tracking Technologies provided by Google on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

139. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the Google Analytics Cookie and DoubleClick API provided by Google on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII, PHI, and sensitive and personal information to Google.

140. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their medical appointments and purchases. This confidential information is then monetized for targeted advertising purposes, among other things.

141. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Google, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

142. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

143. Defendant intentionally intercepted or intentionally assisted in the interception of the contents of Plaintiff's and Class Members' electronic communications for the purpose of

committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPAA and invasion of privacy, among others.

144. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

145. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider . . . (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[25]

146. Plaintiff's information that Defendant disclosed to Google qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used the wire or electronic communications to increase its profits. Specifically, Defendant intentionally embedded and used Google's Tracking Technologies to track and utilize Plaintiff's and Class Members' confidential health information for financial gain. Similarly, Google intended to intercept Plaintiff's and Class Members' confidential health information for

---

[25] 42 U.S.C. § 1320d-6.

its own financial gain.

147. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the Tracking Technologies. Plaintiff and Class Members, all of whom are patients of Defendant, had a reasonable expectation that Defendant would not redirect their communications to Google without their knowledge or consent.

148. The foregoing acts and omissions therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

149. As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq*. under 18 U.S.C. § 2520.

150. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may also award injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

## COUNT II

### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631 (On Behalf of the Subclass)

151. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

152. Plaintiff brings this claim against Defendant individually and on behalf of the Subclass.

153. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to

"protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

154. A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

155. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. Id.

156. To avoid liability under § 631(a), a defendant must show it had the consent of all parties to a communication.

157. At all relevant times, Defendant aided, agreed with, and conspired with to track and intercept Plaintiff's and Subclass Members' internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiff and Subclass Members

158. Defendant, when aiding and assisting Google's wiretapping and eavesdropping, intended to help Google learn some meaning of the content in the URLs and the content the

visitor requested.

159. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, Google's tracking technologies fall under the broad catch-all category of "any other manner":

(a) The computer codes and programs Google used to track Plaintiff and Subclass Members' communications while they were navigating the Website;

(b) Plaintiff's and Subclass Members' browsers;

(c) Plaintiff's and Subclass Members' computing and mobile devices;

(d) Google's web and ad servers;

(e) The web and ad-servers from which Google tracked and intercepted Plaintiff's and Subclass Members' communications while they were using a web browser to access or navigate the Website;

(f) The computer codes and programs used by Google to effectuate their tracking and interception of Plaintiff's and Subclass Members' communications while they were using a browser to visit the Website; and

(g) The plan Defendant and Google carried out to effectuate its tracking and interception of Plaintiff's and Subclass Members' communications while they were using a web browser to visit the Website;

160. The information that Defendant transmitted using Google's tracking technologies constituted sensitive and confidential personally identifiable information.

161. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting Google to receive its patients' sensitive and confidential online communications through the Website without their consent.

162. As a result of the above violations, Defendant is liable to Plaintiff and Subclass Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT III**

**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf of the California Subclass)**

163. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

164. Plaintiff brings this claim against Defendant individually and on behalf of the Subclass.

165. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication.

166. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

167. The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because Subclass Members had an objectively reasonable expectation of private with respect to their personally identifiable

information.

168. Plaintiff and Subclass Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's consistent representations that these communications would remain confidential. Plaintiff and Subclass Members did not expect third parties—such as Google—to secretly eavesdrop upon or record this information and their communications.

169. The tracking technologies from Google are electronic amplifying or recording devices for purposes of § 632.

170. By contemporaneously intercepting and recording Plaintiff's and Subclass Members' confidential communications to Defendant through this technology, third parties, including Google, eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

171. At no time did Plaintiff or Subclass Members consent to Defendant's or Google's conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Google.

172. Google utilized Plaintiff's and Class Members' personally identifiable information for their own purposes, including advertising and analytics.

173. Defendant is liable for aiding and abetting violations of Section 632 by Google.

174. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the putative Class and Subclass defined above, naming Plaintiff as the representative of the putative Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class and Subclass Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the putative Class and Subclass on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiff and the putative Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of any and all issues in this action so triable of right.

Dated: July 21, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: <u>*/s/ Alec M. Leslie*</u>
Alec M. Leslie

Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019

Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: aleslie@bursor.com

**BURSOR & FISHER, P.A**.
Stephen A. Beck
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: sbeck@bursor.com

*Counsel for Plaintiff*